# IN THE COURT OF APPEALS OF IOWA

No. 23-1812
Filed February 5, 2025

IN RE THE MARRIAGE OF RACHEL K. MCDONOUGH
AND WILLIAM J. MCDONOUGH

Upon the Petition of
RACHEL K. MCDONOUGH,
      Petitioner-Appellee,

And Concerning
WILLIAM J. MCDONOUGH,
      Respondent-Appellant.

_____

      Appeal from the Iowa District Court for Polk County, Robert B. Hanson,

Judge.


      A respondent appeals the spousal-support and other financial provisions of

the decree dissolving the parties' marriage. **AFFIRMED AS MODIFIED AND**

**REMANDED WITH DIRECTIONS.**


      Jennifer H. De Kock of Coppola Hockenberg, P.C., West Des Moines, for

appellant.

      Charles Wittmack of Wittmack Law Firm PC, Des Moines, for appellee.


      Heard by Greer, P.J., and Langholz and Sandy, JJ.

**LANGHOLZ, Judge.**

Bill McDonough appeals three financial provisions of the decree dissolving his twenty-eight-year marriage with Rachel McDonough. First, he challenges the $10,000 monthly amount and the lifetime duration of Rachel's traditional-spousal-support award. Second, he argues that the parties should be able to use funds in the children's 529 accounts to pay for their private primary and secondary schooling—not just college. And third, he seeks to vacate a provision that he contends requires him to pay some expenses for the parties' adult children.

Rachel seeks to cut off Bill's appeal out of the gate, contending that he did not preserve error by making his arguments in the district court and getting a ruling on them. But Bill's spousal-support challenges are mainly preserved. So too is his challenge to the restriction on funds in the 529 accounts. Yet we agree with Rachel that Bill's challenge to the provision on payment of the adult children's expenses is not preserved for our appellate consideration.

So on our de novo review, giving appropriate deference to the district court, we agree that the amount of spousal support is equitable. We reject Bill's argument that the award should automatically end when Rachel reaches a specific age or retires—such a change in circumstances must be addressed in a modification proceeding. But because Rachel agrees the award must end if she remarries, we modify the decree accordingly. As for the funds in the 529 accounts, we cannot say that preserving them for college expenses is inequitable. We thus affirm the decree as modified, assess appellate costs to Bill, award Rachel appellate attorney fees, and remand for a determination of the reasonable amount of appellate attorney fees.

### I.    Background Facts and Proceedings

Rachel and Bill met while both attending Loras College in the late 1980s. They were married in July 1994. At the time of the bench trial, they had been married for twenty-eight years and were both in their mid-fifties. They have four children together, two of which were still minors at the time of the trial.[1]

Bill's successful career in the financial services industry has let the family live a comfortable lifestyle. Early on in the marriage, both Bill and Rachel worked for one of Iowa's largest financial-services companies—Bill in finance roles and Rachel in marketing, training, and human resources roles. In the late 1990s, they both accepted new international assignments with the company in Mexico. But while there, their first child was born, and Rachel left her job to care for him.

As the family grew, Bill's career also progressed—returning to Des Moines in 2003, then taking another international assignment in London from 2008 to 2009, before settling back in Des Moines again and eventually moving on to other employers. In 2014, Bill began employment with a financial-services company that required frequent travel—several multi-day trips each month. By the time of trial, Bill was in another new job where, in 2023, he earned a base salary of $375,000 plus $200,000 in an incentive payment. This was in line with his steadily increasing income over the previous years—making roughly $525,000 in 2021 and $545,000 in 2022.

Throughout all this time since 2000, Rachel cared for their children and managed the household. This continued until 2021, when she began substitute

---

[1] At trial, the four children were ages twelve, seventeen, nineteen, and twenty-two.

teaching. Her earnings from teaching in 2022 were around $3000 for the year. But Rachel testified that she should be able to get a job earning $40,000 per year. As of the trial, she was still exploring employment options and considering obtaining additional education that would help her work in an educational role that merged her business training and substitute teaching experience.

During the marriage, Bill and Rachel have prioritized sending their children to Catholic schools. All four attended Catholic elementary schools. Of the three children that were of secondary school age, two of the three had attended Catholic school for all of their secondary education. Bill and Rachel saved and paid for these educational expenses using 529 accounts. Each of them has an account for the benefit of each of the four children, making a total of eight accounts. For their college-aged children, they also used these accounts for college expenses.

Rachel petitioned to dissolve the parties' marriage in 2021. And after a two-day bench trial in January 2023, the district court granted the petition in a thorough, forty-one-page decree. As relevant here,[2] the court ordered Bill to pay Rachel $10,000 per month in traditional spousal support until Rachel's death. The court found Rachel's evidence of her earning capacity and financial expenses more credible than Bill's evidence. So it found that Rachel has an annual earning capacity of about $40,000 and monthly expenses of about $16,000 (roughly $192,000 annually). And the court reasoned that while Rachel would receive a "not insignificant" amount of assets in the property division, "the great bulk of the

---

[2] Bill leaves unchallenged many decree provisions, including the placement of the minor children in the parties' joint legal custody and joint physical care, the equal division of the parties' substantial marital assets, his child-support obligation, and the award of trial attorney fees to Rachel.

estate is held in non-liquid funds, including retirement accounts, pensions, 529 accounts, and real estate," and "the liquid accounts are of an amount that is insufficient to sustain any ongoing support of the level required."  Finding that Bill has an annual earning capacity of at least $575,000, the court thus concluded that Rachel's request of $10,000 per month was "more than fair and equitable under the circumstances."

The court also ordered Bill to pay for the two minor children's private primary and secondary education.  Although the parties had used their 529 accounts to pay for these private-school expenses while married, the court ordered that the accounts "shall be used to pay the Children's post-secondary education expenses."  And as part of the property division, the court equalized the 529 accounts so that "each party has an equal amount in each child's account."

Several additional decree provisions imposed obligations for Bill to pay other expenses related to some or all of the parties' children.  The court ordered "that Bill shall continue to maintain the existing (or comparable) comprehensive medical and dental insurance for the benefit of the Minor Children and the Adult Children for so long as each is eligible to be covered as a dependent child" and required him to pay ninety percent of any out-of-pocket or uncovered medical expenses.[3]  And as part of a longer set of provisions conditioned on the child-support obligations of the decree not being modified further, Bill was ordered to "be responsible for the following children's expenses: . . . [m]obile phones and

---

[3] The decree defined the term "Adult Children" to be the two older children, "Minor Children" to be the younger two, and "Children" to be all four.  In addition to using these capitalized defined terms, the decree also often used the uncapitalized word "children" in various contexts.

monthly service" and "use of a reliable vehicle, including maintenance, gas and insurance."

Bill did not move to reconsider, enlarge, or amend the decree. *See* Iowa R. Civ. P. 1.904(2). Instead, he now appeals.

## II. Error Preservation

Before we can consider a claim of error on appeal, a party must first preserve error by raising the issue in—and getting a ruling from—the district court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). This allows the district court an opportunity to address the error itself "at a time when corrective action can be taken." *In re Marriage of Heiar*, 954 N.W.2d 464, 470 (Iowa Ct. App. 2020) (cleaned up). And it ensures that we are acting as a court of appeals, reviewing a decision already made by the district court rather than considering it for the first time on appeal. *See Meier*, 641 N.W.2d at 537. This error-preservation requirement applies even to dissolution proceedings because we only have jurisdiction to give de novo *review*—"not trial de novo or trial anew." *In re Marriage of Huston*, 263 N.W.2d 697, 699–700 (Iowa 1978).

Rachel argues that none of Bill's arguments are preserved for our review. But we have little difficulty concluding that Bill's challenges to the amount and duration of the spousal-support award—with one exception discussed below in our reasoning on the merits of that issue—are preserved. Much of the trial focused on these issues. Bill made his position plain in his papers and included analysis about the award in his post-trial proposed findings of fact and conclusions of law. And the district court provided thorough reasoning explaining its factual findings and legal conclusions for the award over fourteen of the decree's forty-one pages.

Whether Bill preserved his argument about the decree's restrictions on use of the funds in the children's 529 accounts presents a closer call. Unfortunately, as is often the case in dissolution trials, we have no oral or written closing arguments neatly summarizing the parties' arguments in support of their requested relief. And Bill's post-hearing proposed findings of fact and conclusions of law does not include any express analysis about why the funds in the 529 accounts should not be restricted to college expenses. But scrutinizing the record reveals that Bill's papers, testimony, and cross-examination of Rachel all made clear his position that the 529 accounts should continue to be used for the minor children's primary and secondary education expenses—not restricted to only college. Indeed, when testifying, Bill explained his argument for this position largely mirroring the argument he makes in his brief to us. So too is Rachel's contrary position that the funds in the 529 accounts be preserved for college apparent from the record. And while the district court's decree does not explain its reasoning, the parties agree it decided this dispute and restricted use of the funds in the 529 accounts to college expenses. Bill thus preserved error on his challenge of the decree's restriction on the use of funds in the 529 accounts.

But we agree with Rachel that Bill has not preserved error on his final issue. On appeal, Bill argues that he should not be legally obligated to pay "insurance, medical expenses, mobile phones and monthly service, or the use of a reliable vehicle, including maintenance, gas, and car insurance" for the two adult children because those expenses exceed his statutory obligation for necessary post-secondary-education expenses under Iowa Code section 598.21F (2021). Yet Bill did not make any argument about paying for the expenses of adult children to the

district court. The only time that the adult children's expenses were even mentioned at trial was during Rachel's testimony. He also did not include any analysis rejecting an obligation to pay for these expenses in his post-hearing proposed findings of fact and conclusions of law. And even after the district court included this provision in the decree, Bill did not move for reconsideration or amendment under Iowa Rule of Civil Procedure 1.904(2). *See In re Marriage of Gensley*, 777 N.W.2d 705, 718–19 (Iowa Ct. App. 2009) (holding error was not preserved regarding issue only apparent from text of the decree when neither party filed rule 1.904(2) motion). So Bill has not preserved any error for our review on this issue. *See id.*

### III.  Spousal Support

We review a district court's spousal-support award de novo. *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023). But we still defer to the court's "important, but often conjectural, judgment calls" in deciding an equitable award and must not engage in "undue tinkering" on appeal. *Id.* at 182–83 (cleaned up). So we will "disturb the district court's determination of spousal support only when there has been a failure to do equity." *Id.* at 182 (cleaned up).

"Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case" and the statutory factors in Iowa Code section 598.21A(1). *Id.* at 185 (cleaned up). The district court awarded Rachel traditional spousal support—one of the four forms of spousal support recognized by our supreme court. *See generally id.* at 185–86. Traditional spousal support is "equitable in marriages of long duration to allow the recipient spouse to maintain the lifestyle to which he or she became accustomed." *Id.*

at 185. In deciding an equitable award of traditional spousal support, we give particular attention to the earning capacity of each spouse, their current standards of living, and the spouse's ability to pay weighed against the relative needs of the other spouse. *See In re Marriage of Hitchcock*, 309 N.W.2d 432, 436–37 (Iowa 1981).

Given the parties' twenty-eight-year marriage, Bill does not dispute that it is equitable for Rachel to receive *some* award of traditional spousal support. *See Sokol*, 985 N.W.2d at 185 (noting that "marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support"). Rather, he challenges the amount and duration of the award. He argues that he should pay only $5000—not $10,000—per month. And he argues that the support should terminate when Rachel turns fifty-nine-and-a-half years old, or alternatively "when the parties reach retirement age, die, or Rachel remarries or cohabits with a new partner." We take each argument in turn.

*Amount of Award.* To challenge the amount of the spousal-support award, Bill mainly attacks the district court's findings of Rachel's earning capacity and her projected expenses to maintain the marital lifestyle. Bill argues that Rachel's earning capacity is $60,000 rather than $40,000, pointing to her successful career more than two decades ago and his vocational expert's opinion that Rachel's earning capacity is $85,000. But from its "front-row seat to the live testimony" and the parties' reactions, the district court found Rachel's evidence more credible than the expert witness. *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024). Indeed, the court detailed many defects with the expert's "unpersuasive" analysis—relying on facts contradicted by the testimony, failing to talk to Rachel at all about her

education and work experience, and including inaccurate factual assumptions about Rachel's education based on the expert's personal college experience "as they were in college at the same time."[4] And based on Rachel's "persuasive" testimony, the court found that "Rachel's skills from her prior employment . . . would not necessarily be applicable or transferrable in today's job market" given that "the demands and experience of a human resources professional has changed significantly since Rachel left the workforce twenty-three years ago."

We must give deference to these findings and credibility determinations. *See id.* And on our review of the record, we see no reason to disagree with them. Of course, the precise amount of $40,000 per year is somewhat conjectural—as of the trial, Rachel had not yet made even $3000 per year. *See Sokol*, 985 N.W.2d at 182–83. But if the reality turns out to be substantially different circumstances, a modification proceeding would remain available to reconsider the equities of those circumstances. *See* Iowa Code § 598.21C(1).

On Rachel's projected expenses, Bill made many critiques in the district court but focuses now on Rachel's estimate of her housing expenses, speculating that her expected mortgage payment should be lower than she estimated if she makes the larger down payment Bill thinks she should. But again, the district court found Rachel's proposed budget of $15,756 per month more reasonable and supported by evidence than Bill's $4774 budget. The court reasoned that Bill's budget was "largely hypothetical and not tied to any actual expenses incurred by the parties" and found that "Bill's testimony at trial was at times inconsistent,

---

[4] The expert went so far as to say that even "[i]f the information Bill gave" her about Rachel's credentials and experience "was wrong, [her] opinion would not change."

inaccurate, and even evasive, particularly as to financial matters." The court heard Rachel's testimony of how she calculated her likely housing expenses. And as the district court also noted, even with the $10,000 spousal-support award, Rachel still has a substantial gap between her budget and the resources she would have available from that support and her imputed income. So we do not see any basis in Bill's continued speculative critiques of Rachel's housing expenses to tinker with the $10,000 traditional-spousal-support award. Based on the record here, we agree that this amount is equitable to both parties—maintaining Rachel's standard of living within Bill's ability to pay.

*Duration of Award.* Bill argues that the spousal-support award should end when Rachel reaches the age of fifty-nine-and-a-half years because she "received a significant award of retirement assets" and would be "allowed to withdraw from those funds" at that age.[5] He also more generally contends that the award should end at either party's retirement. And he argues that spousal support should terminate upon Rachel's remarriage or cohabitation.

But neither Rachel's future access to retirement assets nor either party's retirement affects our analysis of whether the duration of this initial award is equitable. As the supreme court has explained, "future retirement will ordinarily be considered to raise too many speculative issues to be considered in the initial spousal support award." *In re Marriage of Gust*, 858 N.W.2d 402, 416 (Iowa 2015).

---

[5] On appeal, Bill requests that spousal support end when Rachel is fifty-nine-and-a-half years old. But at the trial, he requested that spousal support ends at sixty-four years of age. Because his argument fails regardless of the specific age, we do not dwell on the difference or decide whether he waived his only preserved argument by not making it again on appeal.

These issues include when either spouse "will actually retire," "what the relative financial position" of the spouses will be at those times, "whether there will be health considerations that would impact the equities," and if the payor spouse's retirement "will be motivated by a desire to avoid or reduce support obligations." *Id.* at 416–17. And so, unless all these issues can be "presently assessed," the decision whether spousal support should be modified when a party retires "must be made in a modification action when retirement is imminent or has actually occurred." *Id.* at 418. The parties are both only in their mid-fifties, and their retirement and access to retirement funds is not imminent or certain enough to assess these issues and set any future modification to the award now. *See id.*

As for Bill's argument that the spousal-support award should terminate on Rachel's remarriage, in her brief to us, Rachel "concedes that Iowa law provides that it should." She just contends he did not preserve error. But in his testimony and his post-hearing proposed findings of fact and conclusions of law, Bill argued for the award to end on remarriage. And the district court decided the issue by providing that the award would not end until Rachel's death. Bill preserved error.[6] And given Rachel's concession, we modify the decree to provide that Bill's spousal-support obligation will end if Rachel remarries. So modified, we affirm the $10,000 monthly traditional-spousal-support award.

## IV.     Restriction on Use of Funds in the 529 Accounts

The parties agree that the decree requires Bill to pay for the private school expenses of the two minor children who have not yet graduated from high school.

---

[6] But because Bill did not argue in the district court for the award to end on any *cohabitation*, we do not consider that issue. *See Gensley*, 777 N.W.2d at 718–19.

They also agree that it prohibits any of the funds currently in the parties' 529 educational savings accounts for their children from being used to meet this payment obligation—requiring that they be used only for college expenses. *See generally* 26 U.S.C. § 529; Iowa Code ch. 12D. Bill challenges only the restriction on the use of the funds in the 529 accounts, asking us to vacate that order in the decree and "rule that Bill may reimburse himself in accordance with Iowa Law and the Internal Revenue Code."

Bill makes only two arguments against this restriction. First, he argues that it is inequitable to Bill and the children because it was a change from "the parties['] practice during the marriage," "could result in a loss of these funds to the family," and "depletes the funds Bill would otherwise continue to save and spend for the Minor Children during their time in private school." And second, Bill argues that it "contravenes the State of Iowa's express determination that the ability to save for and access 529 funds for elementary and secondary school expenses serves the vital and valid purpose of enhancing the welfare of all Iowa citizens."[7]

Neither argument gives us a basis to disturb the district court's decree. True, the restriction is a change from the parties' practices. But we see no basis in the record or the law to conclude that the family is at risk of losing any of the roughly $420,000 in the 529 accounts. The family still has three children who may

---

[7] Neither party has pointed us to precedent or statutory authority for the district court's restriction on the use of the funds in the 529 accounts. But as Bill does not argue that the court was without power to impose the restriction under chapter 598, we do not consider that issue. *See Jorgensen v. Smith*, 2 N.W.3d 868, 875 (Iowa 2024) (limiting the court's analysis to those arguments made by the appellant relying on "the party-presentation rule" and noting appellate "opinions should not be understood as all-encompassing court-approved treatises on a given body of law" (cleaned up)); *see also* Iowa R. App. P. 6.903(2)(a)(8)(3).

need financial resources to complete college. As Bill himself concedes, funds can be transferred from one child's account to another's if a particular child does not incur enough educational expenses to use all available funds. *See* 26 U.S.C. § 529(c)(3)(C)(i)(II), (c)(3)(C)(ii). And even if funds are still available in one or more accounts after all the children have completed their college (or other higher education), subject to certain limits, funds can be rolled over into Roth IRAs for the beneficiary children too. *See id.* § 529(c)(3)(E). Given Bill's substantial income and wealth—even considering the property division and spousal-support award— we also see no basis to find that Bill will be unable to meet his obligation to pay for the private schooling for the two minor children without the funds in the 529 accounts.[8]

The statutory purpose for establishing Iowa's 529 account program set forth in Iowa Code section 12D.1(1) likewise gives Bill no aid in reversing the restriction. That statute merely expresses the findings of the legislature as to why it enacted the program. *See* Iowa Code § 12D.1(1). It does not contain any operative language at all, let alone any provision governing how a 529 account must be used or whether a dissolution decree may restrict its usage. *See id.* The decree's restriction on the use of the funds in the 529 accounts does not conflict with this statute. We thus affirm the decree's restriction on the use of the funds in the 529 accounts.

---

[8] What's more, at oral argument, Rachel conceded that the decree's restriction applies only to funds in the 529 accounts at the time of the decree. So the restriction would not prevent Bill from taking advantage of the tax benefits of adding additional funds to his 529 accounts for the two minor children and paying for the private schooling with those added funds and gains. And the change from Bill's pre-decree practices is thus reduced—further undermining Bill's claim of inequity.

**V.     Appellate Attorney Fees**

Rachel asks for an award of her appellate attorney fees. We have discretion to award appellate attorney fees in an appeal of a dissolution decree. *See In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). In exercising that discretion, "we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (cleaned up). Considering these factors, we grant Rachel's request for appellate fees.

"[W]e prefer that parties requesting appellate fees do so in their briefs and submit an attorney-fee affidavit immediately after oral argument or after the case is submitted without oral argument" so that we can decide the amount of the award. *In re Marriage of Samuels da Fonseca Silva*, __ N.W.3d __, __, 2024 WL 4370049, at *5 (Iowa Ct. App. 2024). Rachel made a request for fees in her brief but did not submit an attorney-fee affidavit supporting her request or request any specific amount of fees. We thus remand to the district court with directions to decide the reasonable amount of appellate attorney fees to award. *See id.* Appellate costs shall be assessed to Bill.

**AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS**.